In re: METHYL TERTIARY BUTYL ETHER ("MTBE") PRODUCTS LIABILITY LITIGATION

This document relates to:

City of Park City v. Alon USA Energy Inc., et al., 04 Civ.2059(SAS)

City of Dodge City v. Alon USA Energy Inc., et al., 04 Civ.2060(SAS)

Chisholm Creek Utility Authority v. Alon USA Energy Inc., et al., 04 Civ.2061(SAS)

City of Bel Aire v. Alon USA Energy Inc., et al., 04 Civ.2062(SAS)

City of Sioux City, City of Ida Grove, City of Galva, Iowa v. Amerada Hess Corp., et al., 04 Civ. 1723(SAS)

Town of Mishawaka v. Amerada Hess Corp., et al., 04 Civ.2055(SAS)

City of South Bend, Indiana v. Amerada Hess Corp., et al., 04 Civ.2056(SAS)

North Newton School Corp. v. Amerada Hess Corp., et al., 04 Civ.2057(SAS)

City of Rockport v. Amerada Hess Corp., et al., S.D. Ind., 04 Civ. 1724(SAS)

Escambia County Utilities Authority v. Adcock Petroleum, Inc., et al., 04 Civ. 1722(SAS)

Patrick County School Board v. Amerada Hess Corp., et al., 04 Civ.2070(SAS)

Town of Hartland v. Amerada Hess Corp., et al., 04 Civ.2072(SAS)

Quincy Community Services District v. Atlantic Richfield Co., et al., 04 Civ. 4970(SAS)

Town of Marksville v. Alon USA

Energy, Inc., et al., 04 Civ.
3412(SAS)

Town of Rayville v. Alon USA Energy,
Inc., et al., 04 Civ. 3413(SAS)

Buchanan County School Board
v. Amerada Hess Corp., et
al., 04 Civ. 3418(SAS)

Craftsbury Fire District # 2 v.
Amerada Hess Corp., et al.,
04 Civ. 3419(SAS)

Town of Matoaka v. Amerada Hess
Corp., et al., 04 Civ. 3420(SAS)

Town of Campbellsburg, Indiana
v. Amerada Hess Corp., et
al., 04 Civ. 4990(SAS)

No. 1:00–1898.
MDL 1358(SAS).

United States District Court,
S.D. New York.

Sept. 3, 2004.

Robert Gordon, C. Sanders McNew, Stanley N. Alpert, Weitz & Luxenberg, P.C., New York, NY, for Plaintiffs Town of Hartland and Craftsbury Fire District # 2 and Liaison Counsel for Plaintiffs.

Scott Summy, Laura Baughman, Celeste Evangelisti, Baron & Budd, P.C., Dallas, TX, for Plaintiffs City of Park City, City of Dodge City, Chisholm Creek Utility Authority, City of Bel Aire, City of Sioux City, City of Ida Grove, City of Galva, Town of Mishawaka, City of South Bend, North Newton School Corp., City of Rock-

port, Escambia County Utilities Authority, Patrick County School Board, Quincy Community Services District, Town of Marksville, Town of Rayville, Buchanan County School Board, Town of Matoaka, and Town of Campbellsburg.

Peter John Sacripanti, James A. Pardo, Stephen J. Riccardulli, McDermott, Will & Emery, New York, NY, Liaison Counsel for Defendants.

## OPINION AND ORDER

SCHEINDLIN, District Judge.

This multi-district litigation comprises dozens of cases, in which numerous plaintiffs are seeking relief from contamination or threatened contamination of groundwater from various defendants' use of the gasoline additive methyl tertiary butyl ether ("MTBE"). Defendants removed many of the actions from state court, asserting four grounds of federal subject matter jurisdiction: (1) federal agent jurisdiction; (2) substantial federal question; (3) complete preemption; and (4) bankruptcy jurisdiction.[1] The plaintiffs in nine New York cases moved to remand.[2] On March 16, 2004, I denied the motions, holding that this Court has federal agent jurisdiction pursuant to section 1442(a)(1)

of Title 28 of the United States Code, over all MTBE cases pending before it.[3] I found, among other things, that defendants had sufficiently alleged that they added MTBE to gasoline at the direction of the EPA, a federal agency, to comply with the requirements of the Reformulated Gasoline ("RFG") Program and the Oxygenated Fuels ("OF") Program.[4]

At a subsequent status conference, plaintiffs sought clarification of my March 16, 2004 Opinion and Order ("*MTBE III* Opinion") because several of the plaintiffs are located in areas not covered by the RFG or OF programs. Therefore, plaintiffs argued, there could be no federal agent jurisdiction over cases filed in the non-RFG and non-OF areas as a matter of law.[5] Plaintiffs had not distinguished between RFG and non-RFG areas in their prior memorandum of law because they thought they were briefing only the New York cases, and New York is an RFG state.[6] I therefore permitted plaintiffs to move for clarification of the Court's *MTBE III* Opinion.[7] The moving plaintiffs reside in parts of California, Florida, Indiana, Iowa, Kansas, Louisiana, Vermont, Virginia, and West Virginia, that are located outside RFG and OF areas.[8] I now con-

---

1. *See* Notice of Removal ¶¶ 36–59. Because the notices of removal are essentially identical, I refer only to defendants' Notice of Removal in *Patrick County School Board v. Amerada Hess Corp., et al.*, No. 04 Civ.2070.

2. Plaintiffs in the following cases moved to remand: (1) *County of Nassau v. Amerada Hess Corp., et al.*, No. 03 Civ. 9543; (2) *Water Authority of Western Nassau v. Amerada Hess Corp., et al.*, No. 03 Civ. 9544; (3) *Incorporated Village of Mineola, et al. v. AGIP Inc., et al.*, No. 03 Civ. 10051; (4) *West Hempstead Water District v. AGIP Inc., et al.*, No. 03 Civ. 10052; (5) *Carle Place Water District v. AGIP Inc., et al.*, No. 03 Civ. 10053; (6) *Town of Southampton, et al. v. AGIP Inc., et al.*, No. 03 Civ. 10054; (7) *Village of Hempstead v. AGIP Inc., et al.*, No. 03 Civ. 10055; (8) *Town of East Hampton, et al. v. AGIP Inc., et al.*, No. 03

Civ. 10056; (9) *Westbury Water District v. AGIP Inc., et al.*, No. 03 Civ. 10057.

3. *See In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Litig.*, No. M21–88, 2004 WL 515535 (S.D.N.Y. Mar.16, 2004) ("*MTBE III*").

4. *Id.* at *10.

5. *See* Transcript of 3/23/04 MTBE Conference at 8–9.

6. *See id.* at 18.

7. *See id.* at 18–19.

8. *See* Declaration of Michael Grabowski, Plaintiffs' Expert Witness, in Support of Cer-

sider whether federal agent jurisdiction exists over cases filed by plaintiffs in non-RFG and non-OF areas.[9]

## I. BACKGROUND

Familiarity with the Court's previous decisions in this multi-district litigation is assumed.[10] I shall describe only those facts relevant to the determination of these motions.

### A. MTBE

MTBE is a chemical compound that is a byproduct of the gasoline refining process.[11] It has enhanced solubility in water and is chemically attracted to water molecules. Defendants used and continue to use MTBE as a gasoline additive. Sometime after 1979, in order to boost the octane level in higher grades of gasoline, defendants began manufacturing, distributing and/or selling gasoline with MTBE in concentrations averaging approximately two to four percent. Since 1990, defendants have added MTBE to gasoline in concentrations of up to fifteen percent. The publicly articulated justification for adding MTBE to gasoline is that it helps

fuel burn more efficiently, thereby reducing air pollution.[12]

Because of its high solubility, MTBE races through underground water reservoirs, quickly reaching the water table and wells whenever gasoline leaks, spills, or is released into the environment. In addition, MTBE resists physical, chemical, and microbial degradation, which allows it to persist in underground aquifers for many decades, far longer than other components of gasoline. It is known to be carcinogenic in animals and is potentially cancer-causing in humans, as well. Even small quantities of MTBE impart a turpentine-like taste and odor to water, rendering it unfit for human consumption.[13]

Plaintiffs allege that at all relevant times to this litigation defendants have known that adding MTBE to gasoline would result in massive groundwater contamination. As early as 1980, defendants were aware of MTBE's risk to groundwater because of well contamination in Rockaway, New Jersey and Jacksonville, Maryland. Throughout the 1980s and 1990s, subsequent contamination of other wells and aquifers, as well as scientific studies and

tain Plaintiffs' Motion for Clarification ("Grabowski Decl.") ¶ 24.

9. The twenty-one plaintiff water providers who are movants here are: (1) City of Dodge, KS; (2) Chisholm Creek Utility Authority, KS; (3) City of Bel Aire, KS; (4) City of Park City, KS; (5) City of Sioux City, IA; (6) City of Ida Grove, IA; (7) City of Galva, IA; (8) North Newton School Corp., IN; (9) City of South Bend, IN; (10) Town of Mishawaka, IN; (11) City of Rockport, IN; (12) Escambia County Utilities Authority, FL; (13) Patrick County School Board, VA; (14) Town of Hartland, VT; (15) Quincy Community Services District, CA; (16) Town of Marksville, LA; (17) Town of Rayville, LA; (18) Buchanan County School Board, VA; (19) Craftsbury Fire District # 2, VT; (20) Town of Matoaka, WV; (21) Town of Campbellsburg, IN.

10. See In re Methyl Tertiary Butyl Ether Prods. Liab. Litig., 175 F.Supp.2d 593 (S.D.N.Y.

2001) ("MTBE I") (concerning preemption); In re Methyl Tertiary Butyl Ether Prods. Liab. Litig., 209 F.R.D. 323 (S.D.N.Y.2002) ("MTBE II") (denying class certification); MTBE III (federal agent jurisdiction).

11. The facts recited herein are allegations and do not constitute findings of the Court. Because the facts alleged in various complaints are more or less identical, any differences do not affect the jurisdictional analysis. For purposes of this motion, I describe and refer to the allegations set forth in the Third Amended Complaint in Chisholm Creek Utility Authority v. Alon USA Energy, Inc., et al., No. 04 Civ. 2061 ("Compl.").

12. See Compl. ¶¶ 63–69.

13. See id. ¶¶ 74–79.

reports, confirmed the risks posed by MTBE. Although defendants publicly denied the risks, their own documents confirm that they were aware of the harm posed by their use of MTBE.[14]

Despite their knowledge of its risks, defendants conspired to mislead the EPA and the public about the hazards of adding MTBE to gasoline. Defendants failed to provide the EPA with information it sought regarding MTBE's safety, and persuaded the EPA not to undertake additional testing.[15] These actions constitute "Defendants' pattern of exaggerating the environmental benefits of MTBE while understating or concealing the real environmental hazards, all of which Defendants knew or should have known at the time."[16] Defendants continued to use MTBE even though there were safer alternatives available. Plaintiffs claim that defendants had a duty to disclose the risk of MTBE but failed to do so.[17]

Based on these allegations, plaintiffs assert causes of action for: (1) strict liability for design defect and/or sale of a dangerously defective product; (2) strict liability for failure to warn; (3) negligence; (4) public nuisance; (5) private nuisance; (6) trespass; (7) civil conspiracy; and (8) breach of warranty.[18]

## B. Reformulated Gasoline Program and Oxygenated Fuels Program

During the 1950's and 1960's, Congress enacted a series of statutes in order to encourage and assist the states in curtailing air pollution.[19] However, that approach was ineffective, and in 1970, Congress amended the Clean Air Act ("CAA") to increase "federal authority and responsibility in the continuing effort to combat air pollution."[20] The amendments required the EPA to set National Ambient Air Quality Standards ("NAAQS") and required states to meet these standards under the EPA's supervision.[21] In addition, the amendments established some federal control over fuels, such as requiring the registration of fuels and fuel additives.[22]

In 1990, Congress again amended the CAA to address air quality issues in areas of the country that were not in compliance with the NAAQS. These federal requirements mandated the production and sale, by specified dates, of cleaner burning RFG and/or OF in certain parts of the country.[23]

14. See id. ¶¶ 87–116.

15. See id. ¶¶ 118–131.

16. Id. ¶ 133.

17. See id. ¶¶ 185, 194, 199–201.

18. See Compl. ¶¶ 178–234. For the most part, plaintiffs' amended complaints assert the same causes of action. Any differences appear to be a result of the allowance or disallowance of certain claims under different state law. For example, Patrick County School Board does not assert a claim for strict liability for design defect, presumably because Virginia does not recognize such a cause of action. See Priester v. Small, Nos. 26541, 26520, 2003 WL 21729900, at *5 (Va. Cir.Ct. Apr. 14, 2003).

19. See Chevron, U.S.A., Inc. v. NRDC, 467 U.S. 837, 845, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984).

20. Train v. NRDC, 421 U.S. 60, 64, 95 S.Ct. 1470, 43 L.Ed.2d 731 (1975).

21. See 42 U.S.C. § 7409; Train, 421 U.S. at 64–65, 95 S.Ct. 1470.

22. See, e.g., 42 U.S.C. § 7545(a).

23. See Declaration of John B. O'Brien, Defendants' Expert Witness ("O'Brien Decl.") ¶ 20, attached as Exhibit 1 to Defendants' Opposition to Plaintiffs' Motion for Clarification ("Def.Opp.").

Beginning in 1992, the OF Program required the use of OF gasoline in certain geographical areas for up to four winter months each year. OF must contain at least 2.7 percent oxygen by weight. Beginning in 1995, the RFG Program required RFG to be used year round in nine of the most heavily polluted metropolitan areas. RFG must contain at least two percent oxygen by weight.[24] Where OF and RFG areas overlap, OF sold during the four winter months is required to contain 2.7 percent oxygen instead of two percent oxygen while meeting all of the other RFG requirements. The EPA approved the use of seven compounds to achieve the requirements set forth in the RFG and OF Programs: (1) MTBE; (2) ethanol; (3) methanol; (4) tertiary amyl methyl ether ("TAME"); (5) ethyl tertiary butyl ether ("ETBE"); (6) tertiary butyl alcohol ("TBA"); and (7) diisopropyl ether ("DIPE").

As part of the 1990 Amendments, Congress also enacted Anti–Dumping provisions to address concerns of conventional gasoline becoming "dirtier" as a result of the RFG Program. Gasoline refining creates certain byproducts that are "cleaner" and other byproducts that are "dirtier." Therefore, a refiner could theoretically comply with the RFG Program by directing the clean byproducts to RFG, while leaving the dirty ones in conventional gasoline. Congress knew this and therefore directed the EPA to promulgate rules to "ensur[e] that gasoline sold or introduced into commerce ... does not result in average per gallon emissions [of pollutants] in excess of such emissions of such pollutants ... in calendar year 1990...." [25] In essence, all refiners were required to ensure that conventional gasoline sold after 1990 was at least as clean, from an emissions standpoint, as gasoline sold in 1990.[26]

## C. Pipeline Distribution System

Gasoline sold in the United States is distributed through a highly complex system of pipelines, marine tankers, barges, and tank trucks. The distribution system moves over nine million barrels (or 378 million gallons) [27] of gasoline from refineries to consumers daily. While there are several ways to transport refined products, pipelines are the most efficient and important means and transport almost seventy percent of petroleum products. Marine tankers account for approximately twenty-five percent, with the balance consisting of tank truck and rail deliveries.[28]

Over 70,000 miles of pipelines are used to ship and distribute fuel products to areas of the country lacking sufficient refining capacity, such as the Northeast and the Midwest. Although some refiners use their own pipelines, many ship their products through common carrier pipelines, which permit any qualifying shipper to move product between locations by paying a published tariff.[29] Large common carrier pipelines typically ship petroleum product in batches of 25,000 barrels or more. A "batch" is a distinct volumetric parcel of product that is pumped through the pipeline from an origin point to a predetermined destination point.[30]

---

24. *See* Grabowski Decl. ¶ 6.

25. CAA § 211(k)(8)(A), codified at 42 U.S.C. § 7545(k)(8)(A).

26. *See* Def. Opp. at 16–17.

27. One barrel equals forty-two gallons. *See* O'Brien Decl. ¶ 6.

28. *See id.* ¶¶ 6, 8.

29. *See id.* ¶¶ 9–10.

30. *See id.* ¶ 28.

Because the product being transported is fluid, adjacent batches end up mixing with each other at the boundaries.[31] "Transmix" refers to the boundary material between two distinctly different products, such as gasoline and diesel fuel. "Interface" refers to the boundary mix between two different grades of the same product, such as conventional gasoline and RFG. Although interface can be blended directly into the lower quality product and used, transmix cannot be utilized without reprocessing to separate the different products.[32] Federal Regulation provides that the interface between RFG and conventional gasoline may be blended down and sold as conventional gasoline.[33]

The boundaries of the RFG and OF areas do not correspond to the gasoline distribution system because they were defined by the EPA with reference to the NAAQS—not the idiosyncracies of the distribution system. Accordingly, some RFG and OF ends up being sold outside the program areas, in a phenomenon known as "spillover." Spillover occurs for a number of reasons, such as the difficulty of delivering the right product volume at the right time, changes in actual versus predicted demand during transit time, and regional price dislocations. Spillover is especially likely to occur in some of the high demand RFG regions—primarily the larger metropolitan areas.[34]

## II. LEGAL STANDARD

Section 1447(c) of Title 28 provides that a case removed from state court shall be remanded "[i]f at any time before final judgment it appears that the district court lacks subject matter jurisdiction." When a party files a motion to remand challenging the removal of the action from state court, "the burden falls squarely upon the removing party to establish its right to a federal forum by 'competent proof.'"[35] "Out of respect for the independence of state courts, and in order to control the federal docket, 'federal courts construe the removal statute narrowly, resolving any doubts against removability.'"[36] If the removing party cannot demonstrate federal jurisdiction by 'competent proof,' the removal was improper, and the district court must remand the case to the court in which it was filed.[37]

"As a general rule, absent diversity jurisdiction, a case will not be removable if the complaint does not affirmatively allege a federal claim."[38] Federal jurisdiction exists where a case falls within the original "federal question" jurisdiction of the United States district courts: "The district courts shall have jurisdiction of all

---

31. *See id.*

32. *See id.* ¶ 29.

33. *See id.* ¶ 26 (citing 40 C.F.R. § 80.78(a)(5)).

34. *See id.* ¶¶ 35–40.

35. *R.G. Barry Corp. v. Mushroom Makers, Inc.,* 612 F.2d 651, 655 (2d Cir.1979) (quoting *McNutt v. General Motors Acceptance Corp.,* 298 U.S. 178, 189, 56 S.Ct. 780, 80 L.Ed. 1135 (1936)). *See also Wilson v. Republic Iron & Steel Co.,* 257 U.S. 92, 97, 42 S.Ct. 35, 66 L.Ed. 144 (1921); *Carson v. Dunham,* 121 U.S. 421, 425–26, 7 S.Ct. 1030, 30 L.Ed. 992 (1887).

36. *Kings Choice Neckwear, Inc. v. DHL Airways, Inc.,* No. 02 Civ. 9580, 2003 WL 22283814, at *2 (S.D.N.Y. Oct.2, 2003) (quoting *Somlyo v. J. Lu–Rob Enters., Inc.,* 932 F.2d 1043, 1045–46 (2d Cir.1991)). *See also Syngenta Crop Prot., Inc. v. Henson,* 537 U.S. 28, 31, 123 S.Ct. 366, 154 L.Ed.2d 368 (2002).

37. *See, e.g., Kings Choice Neckwear,* 2003 WL 22283814.

38. *Beneficial Nat'l Bank v. Anderson,* 539 U.S. 1, 6, 123 S.Ct. 2058, 156 L.Ed.2d 1 (2003).

civil actions arising under the Constitution, laws, or treaties of the United States."[39] A case "arises under" federal law when federal law creates the cause of action,[40] or "where the vindication of a right under state law necessarily turn[s] on some construction of federal law."[41]

■ "To determine whether the claim arises under federal law, we examine the 'well-pleaded' allegations of the complaint and ignore potential defenses."[42] Thus, the presence of a federal defense does not furnish a sufficient basis for jurisdiction, "even if the defense is anticipated in the plaintiff's complaint, and even if both parties concede that the federal defense is the only question truly at issue."[43] "[A] complaint which appears to be grounded solely in state law actually may be federal in nature, and thus removable, if its true nature has been disguised by the plaintiff's artful pleading."[44]

■ Removal is permitted in two instances where the "well-pleaded complaint" rule is not satisfied. *First*, a case may be removed when a federal statute wholly displaces the state law cause of action though complete preemption.

When the federal statute completely pre-empts the state-law cause of action, a claim which comes within the scope of that cause of action, even if pleaded in terms of state law, is in reality based on federal law. This claim is then removable under 28 U.S.C. § 1441(b), which authorizes any claim that 'arises under' federal law to be removed to federal court.[45]

*Second,* a state law action may be removed to federal court where Congress expressly so provides.[46] Therefore, where a statute specifically gives federal courts jurisdiction over a particular subject matter, removal is proper even where the "well-pleaded complaint" rule is not satisfied.[47]

### III. FEDERAL AGENT JURISDICTION

#### A. Applicable Law

■ The federal officer removal statute is an exception to the "well-pleaded complaint" rule because Congress expressly provided that actions against persons acting under color of a federal officer or agency may be removed to federal court, despite the absence of any federal claims.[48] Section 1442(a) permits a private party to

**39.** 28 U.S.C. § 1331.

**40.** *See Merrell Dow Pharms. Inc. v. Thompson,* 478 U.S. 804, 808, 106 S.Ct. 3229, 92 L.Ed.2d 650 (1986).

**41.** *Franchise Tax Bd. v. Constr. Laborers Vacation Trust,* 463 U.S. 1, 9, 103 S.Ct. 2841, 77 L.Ed.2d 420 (1983).

**42.** *Beneficial Nat'l Bank,* 539 U.S. at 6, 123 S.Ct. 2058.

**43.** *Marcus v. AT&T Corp.,* 138 F.3d 46, 53 (2d Cir.1998) (quoting *Caterpillar v. Williams,* 482 U.S. 386, 392, 107 S.Ct. 2425, 96 L.Ed.2d 318 (1987)).

**44.** *In re "Agent Orange" Products Liability Litig.,* 996 F.2d 1425, 1430 (2d Cir.1993); *see also Marcus,* 138 F.3d at 55; *Schaeffer v.*

*Cavallero,* 29 F.Supp.2d 184, 185 (S.D.N.Y. 1998).

**45.** *Beneficial Nat'l Bank,* 539 U.S. at 8, 123 S.Ct. 2058.

**46.** *See id.*

**47.** *See id.* at 7–8, 123 S.Ct. 2058 (discussing statutes that expressly allow removal to federal court even when no federal cause of action is asserted on the face of the complaint).

**48.** *See Jefferson County v. Acker,* 527 U.S. 423, 431, 119 S.Ct. 2069, 144 L.Ed.2d 408 (1999) ("Suits against federal officers are an exception in this regard. Under the federal officer removal statute, suits against federal officers may be removed despite the non-federal cast of the complaint.").

remove a state court action if (1) the party acted under the direction of a federal officer or agency; (2) the party has a colorable federal defense; and (3) there is a causal connection between the federal direction and the conduct in question.[49]

## B. Discussion

The twenty-one water provider plaintiffs who are movants here all reside in areas not encompassed by the OF or RFG programs. Thus, plaintiffs argue that the Court lacks federal agent jurisdiction with respect to their cases because the EPA never directed that gasoline contain oxygenates of any kind—let alone MTBE—in these plaintiffs' jurisdictions. The OF and RFG programs require only that gasoline sold within certain designated areas must contain an oxygenate. Because the programs' requirements never applied to gasoline sold outside the designated areas, defendants could not have been acting under the direction of a federal officer or agency for purposes of section 1442(a) when they sold gasoline in those areas.[50]

Plaintiffs contend that defendants' use of MTBE in non-OF and non-RFG areas is completely voluntary. MTBE's presence outside designated areas is due to defendants' intentional use of MTBE as an octane enhancer—not the inadvertent sale of

RFG or OF outside program areas.[51] RFG and OF is segregated in the distribution system for use in specified areas. In a competitive market, it is unlikely that RFG would be sold outside covered areas because RFG is generally more expensive than conventional gasoline. Plaintiffs assert that to the extent RFG is distributed in non-RFG areas, it represents defendants' voluntary economic decision not to reprocess interface mixtures of RFG and conventional gasoline.[52]

Defendants make two principal arguments that they were acting at the direction of Congress and the EPA.[53] *First,* federal regulation requires that interface between shipments of RFG and conventional gasoline be classified as conventional gasoline. Regulation 40 C.F.R. § 80.78 states: "No person may combine any reformulated gasoline with any conventional gasoline or blendstock, except that a refiner may do so at a refinery under the requirements specified in § 80.65(i), or if the combined product is designated as conventional gasoline." In explaining this rule, the EPA stated that "[i]nterface mixtures of RFG ... and conventional gasoline must be classified as conventional gasoline."[54] Therefore, RFG is "blended down" into conventional gasoline, which is

49. *See id.*

50. *See* Memorandum of Law in Support of Certain Plaintiffs' Motion for Clarification ("Pl.Mem.") at 4–7.

51. *See id.* at 5; Grabowski Decl. ¶¶ 13, 15, 25. Octane is a measure of the "anti-knock" properties of gasoline, with higher numbers indicating greater protection against engine knock. Engine knock is a phenomenon characterized by inefficient fuel combustion that can lead to physical damage to the engine. Different engine types vary in their susceptibility to engine knock and therefore have different octane requirements. *See* O'Brien Decl. ¶ 27.

52. *See* Reply Memorandum in Further Support of Plaintiffs' Motion for Clarification ("Reply Mem.") at 2–5.

53. Defendants also argue that plaintiffs' allegations of contamination through evaporative air emissions demonstrate that RFG can be transported in myriad ways to non-RFG areas. *See* Def. Opp. at 12. This argument is unavailing because defendants have not pointed to any evidence that Congress or the EPA considered that evaporative air emissions would turn non-covered areas into RFG or OF areas.

54. EPA, Reformulated Gasoline and Anti–Dumping Questions and Answers 143 (July 1, 1994) ("RFG and Anti–Dumping Q & A").

then sold in non-RFG areas. *Second,* defendants assert that RFG is sometimes delivered and sold in non-RFG areas because the boundaries of the areas and the fuel distribution networks do not coincide, thereby resulting in some "spillover" sales of RFG in non-RFG areas.

With respect to the California plaintiff, Quincy Community Services District ("Quincy"), defendants make the additional argument that federal law, in the form of California's federally approved state implementation plan ("SIP"), required that gasoline in Plumas County (where Quincy resides) include oxygenates. The CAA requires each state containing areas not meeting clean air standards to develop a written compliance plan, an SIP, which must then be approved by the EPA.[55] Thus, according to defendants, EPA approval of California's SIP turned the SIP into a federal requirement for purposes of the federal officer removal statute.[56] Plaintiffs counter that EPA approval of California's SIP is of no consequence because California has the authority to regulate its own fuel standards and the EPA has no discretion to reject an SIP that is more stringent than the minimum federal standards. Therefore, the EPA's "pro forma approval" cannot transform the SIP into a federal mandate for purposes of section 1442 removal.[57]

■ Defendants' first argument fails because federal regulation does not *require* RFG to be blended into conventional gasoline. The regulation on which de-

fendants rely specifically provides that RFG and conventional gasoline may be combined "at a refinery under the requirements specified in § 80.65(i)."[58] Subparagraph 80.65(i)(6)(I), in turn, permits any refiner to "use the procedures specified in this paragraph (i) to combine previously certified conventional gasoline with reformulated gasoline … [or] to reclassify conventional gasoline into reformulated gasoline…."[59] Therefore, the EPA contemplated that interface could be reprocessed as RFG and did not necessarily have to be blended into conventional gasoline for sale in non-RFG areas. Furthermore, although the cited EPA document states that interface mixtures of RFG and conventional gasoline must be classified as conventional, the cited passage refers to "those instances where illegal interface mixing occurs."[60] As just discussed, the mixture of RFG and conventional gasoline is not illegal if the interface is processed pursuant to section 80.65(i).

Defendants had a choice. They could: (1) blend down interface into conventional gasoline; (2) reprocess interface to reclassify it as RFG; or (3) refrain from selling interface altogether. I recognize that it may have been prohibitively expensive or impractical to reprocess all interface to prevent RFG from being sold in non-RFG areas. However, unless Congress or the EPA recognized it when they enacted and implemented the RFG Program, defendants cannot claim they acted under the direction of a federal officer for purposes

---

**55.** *See* CAA § 110, codified at 42 U.S.C. § 7410.

**56.** *See* Defendants' Opposition to Plaintiffs' Notices of Joinder to the Pending Motion for Clarification at 9–10.

**57.** *See* Plaintiffs' Reply to Defendants' Opposition to Plaintiffs' Notices of Joinder to the Pending Motion for Clarification at 7–8.

**58.** 40 C.F.R. § 80.78.

**59.** *See also* 40 C.F.R. § 80.65(i)(7) ("Nothing in this paragraph (i) prevents any party from combining previously certified reformulated gasoline from different sources in a manner that does not violate the prohibitions in § 80.78(a).").

**60.** RFG and Anti–Dumping Q & A, *supra* note 54 (question 16).

of the federal officer removal statute when they sold MTBE-containing gasoline outside covered areas. Defendants have not cited, and this Court has not found, any evidence that the federal government knew that defendants would *have to* blend down interface.

By contrast, defendants have sufficiently alleged that the federal government directed them to add MTBE to gasoline for sale in likely spillover areas. The EPA expected that "some reformulated gasoline [would] be sold outside covered areas, due mainly to idiosyncracies of the gasoline distribution system, in a phenomenon commonly referred to as 'spillover.'"[61] The agency knew that "[e]stimates of gasoline 'spillover' from different sources range[d] from less than 10 percent all the way to 25

percent,"[62] despite the "incentive to minimize unnecessary costs, such as spillover."[63] The EPA even took spillover into account when considering how to determine the total oxygen content of gasoline for purposes of complying with the Anti–Dumping rules. It proposed that the total oxygen content equal

the sum of (1) the oxygen required by the oxygenated fuels program in those CO nonattainment areas not in the reformulated gasoline program, (2) the spillover of reformulated gasoline into areas outside that program, and (3) the spillover of oxygenated fuels into areas outside that program.[64]

In addition, Congress was aware that defendants would need to direct at least some MTBE to non-RFG states.[65]

**61.** EPA, Draft Regulatory Impact Analysis: Reformulated Gasoline and Anti–Dumping Regulations 47 (July 1991) ("Draft Impact Analysis"). *Accord* EPA, Final Regulatory Impact Analysis for Reformulated Gasoline 323 (Dec.1993) ("Final Impact Analysis") ("Spillover is the amount of RFG which is expected to be sold either outside a covered area, or before or after the required period of the program."); EPA, Regulation of Fuel and Fuel Additives: Standards for Reformulated Gasoline, 56 Fed.Reg. 31176, 31221 (proposed July 9, 1991) (to be codified at 40 C.F.R. pt. 80) ("Proposed Rule") ("many of these [Northeast States for Coordinated Air Use Management] contain areas in which reformulated gasoline must be sold and thus would receive some spillover of reformulated gasoline...."). *See also* Energy Information Administration ("EIA"), Dep't of Energy ("DOE"), EIA Model Documentation: Petroleum Market Model of the National Energy Modeling System at F–44 (Dec. 30, 1994) (defining "spillover demand"); EIA, DOE, The Energy Information Administration's Assessment of Reformulated Gasoline 28 (Oct. 1994) ("Spillover is expected to occur with RFG because the geographical regions requiring the new fuel do not exactly correspond to existing geographic distribution patterns; hence, some fuel from the regulated areas will spillover and be sold in place of conventional gasoline in nonregulated areas."); Tancred Lidderdale, DOE, Demand, Supply, and Price

Outlook for Reformulated Gasoline 1995, Monthly Energy Review 4 (July 1994) ("Demand, Supply") ("Spillover is also expected to contribute to demand for reformulated motor gasoline.").

**62.** EPA, Draft Impact Analysis, *supra* note 61, at 29.

**63.** EPA, Final Impact Analysis, *supra* note 61, at 323. *See also* EIA, Demand, Supply, *supra* note 61, at 4 ("The expected price differential between reformulated and conventional motor gasoline should provide strong incentive for refiners and marketers to minimize spillover.").

**64.** Proposed Rule, *supra* note 61, at 31222 n. 11.

**65.** *See* 136 Cong. Rec. S6458, S6460 (daily ed. May 17, 1990) (comment of Sen. Daschle that assuming ten or twenty percent spillover would be more reasonable than assuming no spillover); Hearing Before the Subcomm. on Health and Env't of the Comm. on Energy and Commerce, 101st Cong., 1st Sess. (1989) (statement of Jack C. Martin, Director of Public Affairs for the Highway Users Federation, testifying that "[t]he requirement of oxygenated fuels for a major urban area would likely have a spillover effect on the fuel mixtures available in a wide area around the nonattainment area").

Plaintiffs in certain California, Indiana, Vermont, and Virginia cases reside in likely spillover regions due to their current or historical proximity to RFG areas.[66] Accordingly, defendants in those cases have sufficiently alleged that they acted at the direction of a federal officer because the federal government expected to turn some non-covered areas into RFG areas as a practical matter when it promulgated the RFG Program. To the extent there are factual questions as to whether MTBE's presence is traceable to spillover, removal is appropriate to allow a federal court to resolve those issues. Notably, plaintiffs do not dispute that the presence of MTBE in non-RFG states is due at least in part to spillover sales.[67] As plaintiff Quincy is located in a likely spillover region in California, I need not address defendants' final argument regarding SIP approval.

Because federal agent jurisdiction does not extend to all the cases at issue, I now turn to defendants' other jurisdictional bases of removal as to the cases filed in Florida, Iowa, Kansas, Louisiana, and West Virginia.[68]

## IV. SUBSTANTIAL FEDERAL QUESTION

### A. Applicable Law

■ Although "the vast majority of cases brought under the general federal-question jurisdiction of the federal courts are those in which federal law creates the cause of action ... a case may arise under federal law 'where the vindication of a right under state law necessarily turn[s] on some construction of federal law.' "[69] Courts examine whether state law causes of action involve substantial questions of

---

**66.** See O'Brien Decl. ¶ 40; Supplemental Declaration of John B. O'Brien, Defendants' Expert Witness, in Opposition to Plaintiffs' Notices of Joinder to the Pending Motion for Clarification ("O'Brien Supp. Decl.") ¶¶ 12–17, 29–37. These cases include: (1) *North Newton School Corp. v. Amerada Hess Corp., et al.,* No. 04 Civ.2057; (2) *City of South Bend, Indiana v. Amerada Hess Corp., et al.,* No. 04 Civ.2056; (3) *Town of Mishawaka v. Amerada Hess Corp., et al.,* No. 04 Civ.2055; (4) *City of Rockport v. Amerada Hess Corp., et al.,* No. 04 Civ. 1724; (5) *Patrick County School Bd. v. Amerada Hess Corp., et al.,* No. 04 Civ.2070; (6) *Town of Hartland v. Amerada Hess Corp., et al.,* No. 04 Civ.2072; (7) *Craftsbury Fire Dist. # 2 v. Amerada Hess Corp., et al.,* No. 04 Civ. 3419; and (8) *Quincy Cmt'y Servs. Dist. v. Atlantic Richfield Co., et al.,* 04 Civ. 4970. These cases do *not* include: (1) *Buchanan County School Bd. v. Amerada Hess Corp., et al.,* No. 04 Civ. 3418; and (2) *Town of Campbellsburg, Indiana v. Amerada Hess Corp., et al.,* No. 04 Civ. 4990. See O'Brien Supp. Decl. ¶¶ 23, 42.

**67.** See Second Declaration of Dr. Michael Grabowski, Plaintiffs' Expert Witness, in Support of Plaintiffs' Reply Brief Motion for Clarification ("Second Grabowski Decl.") ¶ 6(f), attached as Exhibit B to Reply Memorandum in Further Support of Plaintiffs' Motion for

Clarification ("Reply Mem.") ("Spillover sales of RFG to the states in question to the extent they can be determined were very small compared to the total Conventional Gasoline used.").

**68.** These cases include: (1) *City of Dodge City v. Alon USA Energy, Inc., et al.,* No. 04 Civ. 2060; (2) *Chisholm Creek Util. Auth. v. Alon USA Energy, Inc., et al.,* No. 04 Civ.2061; (3) *City of Bel Aire v. Alon USA Energy, Inc., et al.,* No. 04 Civ.2062; (4) *City of Park City, Kansas v. Alon USA Energy, Inc., et al.,* No. 04 Civ.2059; (5) *City of Sioux City, City of Ida Grove, City of Galva, Iowa v. Amerada Hess Corp., et al.,* No. 04 Civ. 1723; (6) *Escambia County Utils. Auth. v. Adcock Petroleum, Inc., et al.,* No. 04 Civ. 1722; (7) *Town of Marksville v. Alon USA Energy, Inc., et al.,* No. 04 Civ. 3412; (8) *Town of Rayville v. Alon USA Energy, Inc., et al.,* No. 04 Civ. 3413; (9) *Town of Matoaka v. Amerada Hess Corp., et al.,* No. 04 Civ. 3420.

**69.** *Merrell Dow,* 478 U.S. at 808, 106 S.Ct. 3229 (quotation marks and citations omitted); *accord Schaeffer,* 29 F.Supp.2d at 185 ("[F]ederal question jurisdiction does extend to a state law claim as to which a claimant's right to relief necessarily depends on the resolution of a substantial question of federal law.").

federal law because a suit does not "arise under" federal law "unless it really and substantially involves a dispute or controversy respecting the validity, construction or effect of such a law, upon the determination of which the result depends."[70] Thus, courts must look at each of the elements involved in plaintiffs' state law causes of action to determine whether federal law is implicated.[71] However, the mere violation of a federal standard as an element of a state law claim does not necessarily change the nature of the case from state to federal.[72]

## B. Discussion

■ Defendants argue that the Court has substantial federal question jurisdiction because federal law (the CAA) controls the balancing at the heart of each of plaintiffs' product liability, negligence, and nuisance claims. Specifically, federal law determines the balance of costs and benefits that the fact-finder must perform in determining whether there was a defect in or feasible alternative to the allegedly defective product.[73]

Defendants assert that federal law provides the rule of decision in these cases for two reasons. *First,* federal law requires that clean air be given primacy in any determination of RFG content. The CAA directs the EPA to consider air quality above all other factors when regulating RFG. Therefore, a jury must be given an instruction that federal law requires clean air benefits to be weighed more heavily than other factors that might go into the cost-benefit analysis at the heart of plaintiffs' tort claims. *Second,* with respect to claims directed solely at conventional gasoline, the EPA's Anti–Dumping rules require that conventional gasoline not experience any decrease in air quality. Hence, a jury may not trade off clean air emissions degradation against clean water.[74]

Plaintiffs respond that the EPA's obligation to give clean air benefits greater weight in its rule-making proceedings has no bearing on a jury's assessment of state law products liability tort claims. Furthermore, even if it did, it would not create a substantial federal question.[75]

Although defendants direct their balancing argument at multiple causes of action, the argument is only applicable to one of plaintiffs' product liability claims—namely, strict liability for design defect. This cause of action requires, as an element of the claim, that the product in question be unreasonably dangerous.[76] In determining

70. *Merrell Dow,* 478 U.S. at 814 n. 12, 106 S.Ct. 3229 (citing *Shulthis v. McDougal,* 225 U.S. 561, 569–70, 32 S.Ct. 704, 56 L.Ed. 1205 (1912)).

71. *See Shulthis,* 225 U.S. at 569–70, 32 S.Ct. 704.

72. *See Merrell Dow,* 478 U.S. at 814, 106 S.Ct. 3229 ("[T]he congressional determination that there should be no federal remedy for the violation of [the Federal Food, Drug, and Cosmetic Act] is tantamount to a congressional conclusion that the presence of a claimed violation of the statute as an element of a state cause of action is insufficiently 'substantial' to confer federal-question jurisdiction"); *Moore v. Chesapeake & Ohio Ry. Co.,* 291 U.S. 205, 216–17, 54 S.Ct. 402, 78 L.Ed. 755 (1934) (violation of federal standard as an element of state tort recovery does not funda-

mentally change the state tort nature of the action).

73. *See* Def. Opp. at 21; Defendants' Opposition to Plaintiffs' Motion for Remand in *MTBE III* ("Def. Original Opp.") at 21.

74. *See id.* at 22–23.

75. *See* Reply Mem. at 9.

76. *See* Restatement (Second) on Torts § 402, comment I ("The [strict liability] rule ... applies only where the defective condition of the product makes it unreasonably dangerous to the user or the consumer.... The article sold must be dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it, with the ordinary knowledge common to the community as to its characteristics.").

whether the product is defective in design, most jurisdictions follow a "risk-utility balancing" test, in which a product is deemed defective only if the magnitude of the risk outweighs any benefits.[77] As a result, design defect litigation has largely been concerned with the feasibility of safer alternative designs.[78] Thus, the key question is whether plaintiffs' right to relief on their strict liability claims requires resolution of a substantial question of federal law. I conclude that it does not.

*First,* plaintiffs define the defective product as "gasoline containing MTBE." The term "gasoline containing MTBE" can be construed in several ways: (1) RFG containing MTBE; (2) conventional gasoline with MTBE due to the EPA's Anti-Dumping Rules; and/or (3) conventional gasoline with MTBE due to octane enhancement. The federal scheme regulating gasoline content would arguably be relevant under the first two definitions. However, the most logical reading of the complaints is that plaintiffs are referring to the third definition. Plaintiffs' complaints and memoranda of law are peppered with allegations that defendants used MTBE—not because the federal government directed them to—but because such use allowed defendants to profit from a gasoline refining waste byproduct.[79] Moreover, with respect to the non-RFG states, plaintiffs plausibly argue that

MTBE is widely used to boost octane.[80] For instance, they cite a report by the federal Energy Information Administration, which states:

> [D]uring the first few years of the Federal RFG program almost all of the MTBE consumed in the nation was RFG and oxygenated gasoline. Over the last few years it appears that MTBE has found its way back into the conventional gasoline pool as an octane blending component.... Also, the decline in MTBE demand arising from the State bans could depress the market price of MTBE such that it becomes economical to increase its use as an octane blendstock.[81]

Therefore, it is not clear that a jury would ever consider the federal government's evaluation of the benefits of clean air if plaintiffs eventually prove that MTBE's presence in Florida, Iowa, Kansas, Louisiana, and West Virginia is due to octane enhancement.

*Second,* even if a jury had to consider the CAA and the EPA's regulations, this does not raise a substantial question of federal law. The Supreme Court has cautioned: "[T]he mere presence of a federal issue in a state cause of action does not automatically confer federal-question jurisdiction."[82] In this case, consideration of the federal scheme of gasoline content regulation does not fundamentally alter the

---

77. *See MTBE I,* 175 F.Supp.2d at 623.

78. *See* Restatement (Third) on Torts § 2(b) ("A product is defective in design when the foreseeable risks of harm posed by the product could have been reduced or avoided by the adoption of a reasonable alternative design by the seller or other distributor [ ] and the omission of the alternative design renders the product not reasonably safe."). The relevant jurisdictions are in accord with the Restatement (Third). *See id.,* comment d (summarizing American case law on the general test for defective product design); Prosser

and Keeton on Torts at 699–700 (5th ed.1984).

79. *See* Compl. ¶¶ 67–69, 140, 184–85, 226; Pl. Mem. at 5; Reply Mem. at 4–5. *See also* Grabowski Decl. ¶ 15.

80. *See* Grabowski Decl. ¶¶ 14–23.

81. EIA, DOE, Motor Gasoline Outlook and State MTBE Bans 2–3, attached as Exhibit 12 to Grabowski Decl.

82. *Merrell Dow,* 478 U.S. at 813, 106 S.Ct. 3229.

state tort nature of plaintiffs' actions.[83] The CAA did not eliminate or alter the defendants' duties of care; it merely supplied potential defenses, such as conflict preemption. The question remaining to be litigated, however, is whether defendants breached their duties or engaged in other tortious conduct—which is a question of state law. Therefore, the Court lacks substantial federal question jurisdiction over plaintiffs' claims.

## V. COMPLETE PREEMPTION

### A. July 16, 2002 Opinion and Order

On July 16, 2002, this Court issued an opinion and order, holding that state law claims concerning the contamination of groundwater by MTBE are not preempted by the CAA.[84] Although familiarity with the opinion is assumed, I shall briefly summarize the analysis here because it informs defendants' arguments regarding complete preemption.

In *MTBE I*, private well owners sued many petroleum companies, seeking relief from the contamination or threatened contamination of their wells as a result of the defendants' use of MTBE. Like plaintiffs here, the *MTBE I* plaintiffs asserted causes of action for strict liability for design defect, failure to warn, public nuisance, negligence, and conspiracy to market an unsafe product, among other claims.[85] The defendants argued that the claims should be dismissed as expressly and conflict preempted.[86]

In holding that the claims were not preempted, I examined the text, purpose, and legislative history of the CAA and concluded that Congress did not intend to preempt the plaintiffs' state law claims.[87] Section 211(c)(4)(A) of the CAA provides, in relevant part:

> [N]o State (or political subdivision thereof) may prescribe or attempt to enforce, *for purposes of motor vehicle emission control,* any control or prohibition respecting any characteristic or component of a fuel or fuel additive ... (ii) if the Administrator has prescribed ... a control or prohibition applicable to such characteristic or component.... [88]

Thus, the CAA's preemption provision specifically limits the reach of the statute to

---

**83.** Defendants cite a number of state law cases for the proposition that federal question jurisdiction exists where federal law provides the rule of decision in a case. However, the cited cases are inapposite. In *Marcus*, 138 F.3d at 46, the plaintiff's breach of warranty claim was predicated on a tariff defendants filed pursuant to federal law. The claim necessarily raised a substantial federal question because the federal tariff defined the relationship between the parties. *See id.* at 55–56. In *Bright v. Bechtel Petroleum, Inc.*, 780 F.2d 766 (9th Cir.1986), the plaintiff's breach of employment contract claim was based on his employer's withholding of income tax pursuant to federal law. The court found that although artfully pled as a breach of contract claim, the plaintiff was in fact challenging the federal tax law. *See id.* at 769. In addition, *Drawhorn v. Qwest Communications Int'l, Inc.*, 121 F.Supp.2d 554 (E.D.Tex.2000), is distinguishable because in that case, all of the plaintiff landowner's claims turned on the

interpretation of the federal railway statutes to determine the existence of an easement. Likewise, *Schaeffer*, 29 F.Supp.2d at 195, is distinguishable because the plaintiff's right to relief as a result of expulsion from an airplane was governed by a provision of the Federal Aviation Act, permitting the airline to refuse to transport passengers or property deemed to be unsafe. As previously explained, plaintiffs' right to relief in this case does not hinge on the interpretation of the CAA.

**84.** *See MTBE I,* 175 F.Supp.2d 593.

**85.** *See id.* at 606.

**86.** *See id.* at 611.

**87.** *See id.* at 612.

**88.** Codified at 42 U.S.C. § 7545(c)(4)(A) (emphasis added).

preempt state regulation only when it is "for purposes of motor vehicle emission control." The statute's purpose supports such an interpretation because the purpose of the CAA is to "protect and enhance the quality of the Nation's *air resources* so as to promote the public health and welfare and the productive capacity of its population."[89] In addition, legislative history indicates that Congress, through the RFG Program, sought to reduce harmful vehicle emissions in the "larger context of market forces, health and environmental impacts, regional priorities, technological feasibility and other considerations."[90] I therefore held that the plaintiffs' state law claims fell outside the scope of preemption because they concerned groundwater contamination; the claims were not brought for purposes of motor vehicle emission control.[91] I did not reach the issue of conflict preemption because resolving that issue involved questions of fact that could not be addressed on a motion to dismiss.[92]

### B. Applicable Law

■ In determining whether a state law claim is completely preempted, courts "start with the assumption that the histor-

ic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress."[93] "Congressional purpose is the 'ultimate touchstone' of preemption analysis."[94] Congressional intent may be explicitly stated in the statute's text or implicitly contained in its structure and purpose.[95] Where the statutory provision contains preemptive language, the court need not go beyond that language to determine whether Congress intended to preempt at least some state law.[96] The court must determine the domain expressly preempted by that language, bearing in mind that "each case turns on the peculiarities and special features of the federal regulatory scheme in question."[97]

■ "Federal regulations have no less pre-emptive effect than federal statutes."[98] The preemptive force of a regulation does not depend on express Congressional authorization to displace state law.[99] "Where Congress has directed an administrator to exercise his discretion, his judgments are subject to judicial review only to determine whether he has exceeded his statutory authority or acted arbitrarily."[100] Therefore, the proper inquiry is (1) whether the

---

**89.** 42 U.S.C. § 7401(b)(1) (emphasis added).

**90.** *MTBE I*, 175 F.Supp.2d at 613 (quoting *Oxygenated Fuels Ass'n v. Pataki*, 158 F.Supp.2d 248, 256 (N.D.N.Y.2001)).

**91.** *See id.* at 611–15.

**92.** *See id.* at 616.

**93.** *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 116 S.Ct. 2240, 135 L.Ed.2d 700 (1996) (quotation marks and citation omitted).

**94.** *Cipollone v. Liggett Group, Inc.*, 505 U.S. 504, 516, 112 S.Ct. 2608, 120 L.Ed.2d 407 (1992).

**95.** *See id.* at 516, 112 S.Ct. 2608.

**96.** *See Medtronic*, 518 U.S. at 484, 116 S.Ct. 2240.

**97.** *City of Burbank v. Lockheed Air Terminal, Inc.*, 411 U.S. 624, 638, 93 S.Ct. 1854, 36

L.Ed.2d 547 (1973). *See also Medtronic*, 518 U.S. at 484, 116 S.Ct. 2240 (noting that the court must identify the domain expressly preempted).

**98.** *Fidelity Fed. Savs. and Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 153, 102 S.Ct. 3014, 73 L.Ed.2d 664 (1982); *accord Katharine Gibbs School Inc. v. FTC*, 612 F.2d 658, 667 (2d Cir.1979) ("It has long since been firmly established that state statutes and regulations may be superseded by validly enacted regulations of federal agencies....").

**99.** *See Fidelity*, 458 U.S. at 154, 102 S.Ct. 3014.

**100.** *Id.; accord Oxygenated Fuels*, 158 F.Supp.2d at 255 ("[T]he question before this Court is not whether Congress expressly authorized EPA to displace state law, but rather whether doing so is reasonably within EPA's delegated powers.").

administrator intended to preempt the state law, and if so, (2) whether the action was within the scope of the administrator's delegated authority.[101]

## C. Discussion

 Defendants argue that plaintiffs' claims are completely preempted because EPA regulations governing RFG content and the Anti–Dumping rules have preemptive force, even if the CAA itself does not displace state law. Defendants assert that the EPA intended by regulation to preempt any dissimilar state controls of fuel additives and that the agency had authority to do so under sections 211(k) and 211(c) of the CAA. Section 211(k) grants the EPA broad rule-making authority to implement the RFG program and Anti–Dumping rules, while section 211(c) contains the express preemption provision.[102]

Defendants contend that plaintiffs' claims are not saved (as plaintiffs argue) because the claims are allegedly not "for purposes of motor vehicle emission control."[103] Defendants first argue that plaintiffs' claims do, in fact, attempt to regulate emissions for the following reason. If plaintiffs are successful, defendants would be barred from using MTBE because it would be classified as a defective product, based, in part, on its discharge into the air when gasoline is combusted.

Defendants next argue that plaintiffs (and this Court) incorrectly read the statute [quoted earlier at text accompanying note 86] as permitting states to "prescribe or attempt to enforce" regulation of fuel

content so long as it is for some purpose other than motor vehicle emission control. Rather, the clause "for purposes of motor vehicle emission control" only modifies the phrase "attempt to enforce"—and not "prescribe"—because according to grammatical rules, a qualification placed after the disjunctive word "or" applies only to the term after the disjunction. Therefore, the preemption provision is properly read: "[N]o state (or political subdivision thereof) may prescribe . . . any control or prohibition respecting any characteristic or component of a fuel additive. . . ."[104] In any case, the qualification in section 211(c) is not determinative because the EPA also promulgated its rules pursuant to 211(k), which does not contain the restriction.[105]

Defendants finally argue that federal law provides several exclusive remedies for parties seeking to alter the design of RFG—to wit, (1) effecting change through the rule-making process; (2) through EPA approval of state implementation plans; (3) EPA authority to ban MTBE under the Toxic Substances Control Act; and (4) a remedy for leaking underground storage tanks under the Resource Conservation and Recovery Act. Specifically with respect to groundwater contamination, state law continues to provide remedies against those parties responsible for spills, leaking tanks, or other releases of MTBE into groundwater.[106]

To determine whether plaintiffs' state law claims are completely preempted, the Court must consider (1) whether the EPA meant to preempt state law claims based on groundwater contamination, and if so (2) whether the EPA was acting within the

---

**101.** *See Fidelity,* 458 U.S. at 154, 102 S.Ct. 3014.

**102.** *See* Def. Opp. at 16–18; Def. Original Opp. at 25, 27.

**103.** *See* Def. Opp. at 19; Def. Original Opp. at 28.

**104.** *See* Def. Opp. at 19–20; Def. Original Opp. at 24, 26–27.

**105.** *See* Def. Opp. at 20; Def. Original Opp. at 27.

**106.** *See* Def. Original Opp. at 28–31.

scope of its delegated authority.[107] Because Congress delegated its authority to the EPA, the agency is "uniquely qualified to determine whether a particular form of state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress."[108] If the EPA promulgated regulations intended to preempt state law, the Court "should not disturb [them] unless it appears from the statute or its legislative history that the accommodation is not one that Congress would have sanctioned."[109]

### 1. The EPA did not intend to preempt the field of fuel content regulation for all purposes.

The EPA has expressed its understanding of the preemptive effect of its fuel content regulations:

> The national scope of gasoline production and distribution suggests that federal rules should preempt State action to avoid an inefficient patchwork of potentially conflicting regulations. Indeed, Congress provided in the 1977 Amendments to the Clean Air Act that federal fuels regulations preempt non-identical State controls *except under specified circumstances* (see, section 211(c)(4) of the Clean Air Act). EPA believes that the same approach to federal preemption is desirable for the reformulated gasoline and anti-dumping programs. EPA, therefore, is issuing today's final rule under the authority of sections 211(k) and (c), and promulgates *under*

*section 211(c)(4)* that dissimilar State controls be preempted unless either of the exceptions to federal preemption specified by section 211(c)(4) applies.

. . . . .

> EPA believes that the *limited* federal preemption promulgated here appropriately balances the utility and efficacy of uniform national rules with States' needs to address their unique pollution problems.[110]

Thus, the EPA intended its regulations to have "limited" preemptive effect under the "specified circumstances" of section 211(c)(4). As I explained in *MTBE I*, that section limits preemption to state regulation of fuel and fuel additives "for purposes of motor vehicle emission control."

With respect to RFG, the EPA has reinforced this understanding of limited preemption in subsequent regulations and in other remarks to Congress. For instance, the agency has said:

> neither section 211(m) nor section 211 as a whole establishes a comprehensive federal presence. Instead, the fuels programs under section 211 provide a number of federal requirements but also explicitly preserve a role for the states in regulating fuels. Section 211(c)(4) preempts state action, but only under certain circumstances.... [111]

This explains why the EPA advised states that "any Federal controls on volatility would preempt any state and local *emission-related* provisions"[112] and that states

---

107. *See Fidelity*, 458 U.S. at 154, 102 S.Ct. 3014.

108. *Medtronic*, 518 U.S. at 496, 116 S.Ct. 2240 (quotation marks and citation omitted).

109. *Fidelity*, 458 U.S. at 154, 102 S.Ct. 3014.

110. EPA, Regulation of Fuels and Fuel Additives: Standards for Reformulated and Conventional Gasoline, 59 Fed.Reg. 7716, 7809

(Feb. 16, 1994) (to be codified at 40 C.F.R. pt. 80) ("Final Rule") (emphasis added).

111. EPA, Approval and Promulgation of Implementation Plans; Nevada State Implementation Plan Revision ("Nevada SIP Approval"), 64 Fed.Reg. 29573, 29578 (June 2, 1999).

112. EPA: Ozone and the Clean Air Act, Hearing Before the Subcomm. on Oversight and Investigations, Comm. on Energy and Com-

"have authority to regulate a fuel's components or qualities *for the purpose of emission control* until EPA establishes Federal controls or prohibitions...." [113] Moreover, the EPA approved a state proposal requiring higher oxygen fuel content than that mandated by the CAA because "[t]he legislative history indicates that Congress intended to provide flexibility to states regarding oxygen content, and did not want to restrain that flexibility by setting a federal mandate for a specific oxygen level that states must require." [114] Given the EPA's reluctance to preempt state regulation in the area of emission control—an area expressly preempted by the CAA—it is difficult to believe that the EPA intended to preempt state regulation of fuel content to prevent and remediate groundwater contamination.

Similarly, the EPA, through its Anti-Dumping rules, only intended to preempt the field of conventional gasoline content to the extent pollutant emissions could become worse as a result of the RFG Program. In seeking comments on proposed

options for determining 1990 baseline toxic emissions, the EPA stated that "[t]he key issue is the likelihood of increased toxic emissions occurring, particularly through the fuel parameters which are not addressed by the less stringent options." [115] The EPA was not inclined to regulate the components of conventional gasoline where emissions were not expected to increase, [116] nor where the environmental benefits were only marginal at best. [117] The agency's focus was on pollutant emissions, and defendants have not offered any evidence to indicate otherwise.

## 2. The EPA does not have authority to preempt the field of fuel content for all purposes.

Even assuming *arguendo* that the EPA intended to preempt state regulation of fuel content for all purposes, defendants' argument would still fail because the EPA does not have the authority to effect such blanket federal preemption. Sections 211(c) and (k) of the CAA only authorize the EPA to promulgate controls or prohibitions on fuel content as they relate to pollutant emissions. [118]

merce ("Ozone Hearings"), 100th Cong., 1st Sess. (daily ed. Apr. 27, 1987) (EPA response to question 8(c) from Rep. John Dingell) (emphasis added).

113. Ozone Hearings, 100th Cong., 1st Sess. (daily ed. Apr. 24, 1987) (response to question 17, advising that Northeast States Coordinated Management proposal was not inconsistent with section 211(c)(4) at that time because EPA had not yet established controls on fuel volatility) (emphasis added).

114. Nevada SIP Approval at 29578; *accord Exxon Mobil Corp. v. United States Environmental Protection Agency*, 217 F.3d 1246, 1256 (9th Cir.2000) (holding that the EPA's approval of Nevada regulation was permissible construction of the CAA). *See also* Ozone Hearings, *supra* note 112 (stating that Denver's oxygenated fuels strategy could be approved as part of its state implementation plan).

115. Proposed Rule, *supra* note 61, at 31219.

116. *See id.* ("The four pollutant emissions (VOC, NOx, CO and toxics) are discussed ... because seasonal variations and other EPA regulations affect specific emissions.... For these emissions that are not expected to increase, it may be appropriate not to include coverage of these emissions in the anti-dumping requirements.").

117. *See id.* at 31221 ("Without knowing more, EPA believes that the environmental benefits of regulating VOC emissions under the anti-dumping provisions are marginal at best and not worth the Administrative burden on the Agency or the industry."); *id.* at 31222 ("EPA does not believe that the marginal environmental benefits of regulating CO emissions of conventional gasoline would be worth the cost and so proposes not to regulate them.").

118. *See Oxygenated Fuels*, 158 F.Supp.2d at 255 ("[T]he powers granted to EPA by the CAA amendments of 1990 pertaining to fuel regulation did not encompass the entire field

Although the Court has already ruled on the preemptive scope of section 211(c)(4), I now address defendants' semantic argument and find that it lacks merit. Defendants urge that the qualification "for purposes of motor vehicle emission control" only modifies the phrase "attempt to enforce," and therefore, the scope of preemption is actually broader than the Court held in *MTBE I*. However, defendants' tortured interpretation defies the structure and function of the CAA.

In interpreting the text of a statute, the Supreme Court has advised:

> [T]ext consists of words living 'a communal existence,' in Judge Learned Hand's phrase, the meaning of each word informing the others and 'all in their aggregate tak[ing] their purport from the setting in which they are used. Over and over we have stressed that in expounding a statute, we must not be guided by a single sentence or member of a sentence, but look to the provisions of the whole law, and to its object and policy.... Statutory construction is a holistic endeavor.[119]

Even without looking beyond section 211(c), it is plain that the requirement of motor vehicle emission control extends to prescriptions of fuel content and not just attempts to enforce existing prescriptions. Indeed, paragraph (1) of section 211(c) grants the Administrator authority to

> control or prohibit the manufacture, introduction into commerce, offering for sale, or sale of any fuel or fuel additive

> ... (A) if in the judgment of the Administrator *any emission product of such fuel or fuel additive causes, or contributes, to air pollution* ... or, (B) if *emission products* of such fuel or fuel additive will impair to a significant degree the performance of any *emission control device or system* ....

(emphasis added). Hence, the EPA's authority to prescribe fuel regulations is a function of motor vehicle emission effects. Logic dictates that the EPA would only have the power to preempt areas of state law over which the agency itself has regulatory authority.[120] If it were otherwise, the anomalous result would be that neither the federal government nor the states could regulate fuel characteristics and components that are *unrelated* to motor vehicle emissions.

The EPA's understanding of the preemption provision comports with the Court's analysis. In response to a question concerning the legality of Colorado's proposal to mandate the use of oxygenates in gasoline, the agency responded that section 211(c)(4) "prohibits states from *prescribing controls or prohibitions, for the purpose of emissions control,* regarding the use of automotive fuels or fuel additives if the Administrator has prescribed a different control under section 211(c) regarding that fuel additive...." [121]

Nor does section 211(k) empower the EPA to preempt state regulation of fuel content for all purposes. With respect to RFG, the EPA was directed to promulgate

---

of legislation affecting fuel and fuel additives for whatever purpose....").

**119.** *United States Nat'l Bank of Or. v. Independent Ins. Agents of Am.*, 508 U.S. 439, 454–55, 113 S.Ct. 2173, 124 L.Ed.2d 402 (1993) (quotation marks and citations omitted).

**120.** *Cf. Oxygenated Fuels Ass'n, Inc. v. Davis*, 331 F.3d 665, 670 (9th Cir.2003) ("[T]he language of the Section 211(c)(4)(A) express preemption provision parallels the language of the (c)(4)(B) exemption.... The two provisions are precisely coextensive. Therefore, because California's MTBE ban does not fit within the (c)(4)(B) exemption provision, it also does not fit within the (c)(4)(A) provision and is not expressly preempted.").

**121.** *Ozone Hearings, supra* note 112 (emphasis added).

regulations requiring the "greatest reduction in ... emissions of toxic air pollutants...." Not only does section 211(k) set forth requirements for reducing certain emissions, but it also establishes performance standards (from an emissions standpoint) for RFG.[122] Furthermore, the Administrator must certify a fuel formulation if it complies with the general requirements concerning nitrogen oxide emissions, content of oxygen, benzene, and heavy metals, and if the formulation achieves "equivalent or greater reductions in emissions ... of toxic air pollutants."[123] The emphasis is clearly on emissions control.[124]

Likewise, section 211(k)(8), governing the Anti–Dumping rules, is solely concerned with preventing the increase of pollutants in conventional gasoline. That section directs the EPA to promulgate regulations to ensure that conventional gasoline is at least as clean as it was in 1990.[125] Nowhere does it instruct or permit the EPA to regulate conventional gasoline generally. The fact that section 211(k) does not contain the express qualification "for purposes of motor vehicle emission control" does not mean that such a limitation does not exist.

The CAA's citizen suit provision supports this Court's finding that Congress would not have sanctioned the EPA's preemption of state law causes of action unrelated to motor vehicle emission control. The CAA creates a federal private right of action "against any person ... who is alleged to have violated ... or to be in violation of (A) an emission standard or limitation under this chapter or (B) an order issued by the Administrator or a State with respect to such a standard or limitation."[126] The statute does not, however, provide remedies for the types of violations the plaintiffs allege. Plaintiffs allege actual or threatened groundwater contamination from MTBE-containing gasoline. They seek relief in the form of, *inter alia*, investigation, testing and monitoring, alternative water, well head treatment, and early detection systems for wells. Prevailing on a federal claim to enforce gasoline emissions standards would not necessarily remedy plaintiffs' injuries. For example, upon a finding that a defendant's RFG did not meet the emissions standards, the defendant could comply by adding more MTBE to its RFG instead of a non-contaminating oxygenate.

Furthermore, the CAA contains a savings clause, which preserves "any right which any person (or class of persons) may have under any statute or common law to seek enforcement of any emission standard or limitation or *to seek any other relief* ...."[127] The statute's preemption provision and savings clause must be read together because a "savings clause assumes that there are some significant number of common-law liability claims to save."[128] In this case, the savings provision makes clear that section 211(c)(4) does not preempt all state law claims prescribing controls or prohibitions on gasoline content.[129] It reflects a Congressional determination that occasional non-uniformity is

---

**122.** *See* 42 U.S.C. § 7545(k)(2)—(3).

**123.** 42 U.S.C. § 7545(k)(4)(B).

**124.** *See* Final Rule, *supra* note 110, at 7809 ("Section 211(k) of the Clean Air Act indicates that the primary purposes of reformulated gasoline are to reduce ozone-forming VOC emissions during the high ozone season and emissions of toxic air pollutants during the entire year.").

**125.** *See* 42 U.S.C. § 7545(k)(8).

**126.** 42 U.S.C. § 7604(a)(1).

**127.** 42 U.S.C. § 7604(e) (emphasis added).

**128.** *Geier v. American Honda Motor Co.,* 529 U.S. 861, 868, 120 S.Ct. 1913, 146 L.Ed.2d 914 (2000).

**129.** *See Her Majesty the Queen in Right of the Province of Ontario v. City of Detroit,* 874 F.2d 332, 342–43 (6th Cir.1989) (plain language of the CAA's savings clause compelled conclu-

acceptable in order to promote the public health and welfare.[130] Thus, it is implausible that Congress gave the EPA authority to completely preempt claims for groundwater contamination.

Defendants argue that plaintiffs have other remedies for groundwater contamination, which would not result in the impermissible regulation of fuel content by states. However, the CAA's preemptive effect on plaintiffs' claims does not turn on whether federal law *generally* provides the exclusive remedies, but whether the statute in question provides the only recourse to plaintiffs.[131] In the two categories of cases where the Supreme Court has found complete preemption—certain causes of action under the Labor Management Relations Act and the Employment Retirement Income Security Act—the federal statutes provided the exclusive causes of action and also set forth procedures and remedies governing them.[132] This makes sense because an exclusive federal cause of action would be a clear indication that Congress intended to completely preempt a field.[133] That is not the case here.

### 4. Plaintiffs' claims are not completely preempted.

Defendants argue that plaintiffs' claims are preempted because plaintiffs contend,

*inter alia,* that MTBE is emitted from car tailpipes and falls back to the earth as rain.[134] This final argument is unavailing because the central inquiry is whether the legal duty that is the predicate for plaintiffs' state law claims constitutes a prescription or attempt to enforce fuel regulations for purposes of motor vehicle emission control.[135] Plaintiffs' claims are preempted only if they would impose a state law regulation of gasoline for emissions purposes.

Plaintiffs' claims fall outside the scope of the narrowly preempted field of fuel regulation. Although plaintiffs' product liability claims seek to regulate gasoline as a product, they do so only to prevent contamination of groundwater by MTBE. Furthermore, the state tort claims are principally aimed at regulating certain behavior by defendants, rather than control of the fuel product itself. For instance, the predicate duty for negligence claims is the general duty of every manufacturer to use due care to avoid foreseeable dangers caused by its products.[136] The precondition for the failure to warn claims is the duty to inform users and purchasers of the risks associated with using potentially dangerous products.[137] And the prerequisite for claims of conspiracy to misrepresent or conceal material facts is the duty not to

sion that plaintiffs were not precluded from pursuing air pollution claims based on the Michigan Environmental Protection Act).

**130.** *See Geier,* 529 U.S. at 871, 120 S.Ct. 1913 (savings clause in the National Traffic and Motor Vehicle Safety Act of 1966 reflects a Congressional determination that the policy of enforcing safety standards and compensating victims disfavors preemption).

**131.** *See Beneficial Nat'l Bank,* 539 U.S. at 9, 123 S.Ct. 2058 (holding that the plaintiffs' cause of action arose under federal law because the National Bank Act provided the exclusive cause of action).

**132.** *See id.* at 8, 123 S.Ct. 2058.

**133.** *See Medtronic,* 518 U.S. at 487, 116 S.Ct. 2240 (finding it implausible that Congress would preclude state courts from affording state consumers any protection from injuries resulting from a defective product without expressly so stating).

**134.** *See* Def. Opp. at 19; Def. Original Opp. at 28.

**135.** *See Cipollone,* 505 U.S. at 524, 112 S.Ct. 2608.

**136.** *See Medtronic,* 518 U.S. at 501, 116 S.Ct. 2240.

**137.** *See id.*

commit fraud.[138] These duties arise independently of the regulation of fuel content. Plaintiffs' nuisance, trespass, and breach of warranty claims are similarly broad. Therefore, the breadth of most of plaintiffs' claims place them outside the limited scope of preempted fuel regulations authorized by Congress.[139]

## VI. BANKRUPTCY JURISDICTION

### A. Applicable Law

▆▆▆ Section 1334(b) of Title 28 provides federal district courts with original but not exclusive jurisdiction of all civil proceedings (1) arising under title 11 of the Bankruptcy Code; (2) arising in cases under title 11; and (3) related to cases under title 11.[140] A proceeding "arises under" title 11 if it is predicated on a right created by the Bankruptcy Code.[141] A proceeding "arises in" a title 11 case if it "would have no existence outside of the bankruptcy."[142] And a proceeding is "related to" a title 11 case if it could conceivably have an effect on the bankruptcy estate.[143] "Arising under" and "arising in" cases are collectively called "core" bankruptcy proceedings, while "related to" cases are non-core.[144]

▆▆▆ It is important to distinguish between core and non-core cases because this determination signals whether mandatory or discretionary abstention will apply.[145] If a proceeding is non-core, mandatory abstention may be applicable. A party seeking mandatory abstention must demonstrate that: (1) the motion to abstain was timely; (2) the action is based

**138.** See *Cipollone*, 505 U.S. at 530, 112 S.Ct. 2608.

**139.** See *Medtronic*, 518 U.S. at 502, 116 S.Ct. 2240.

**140.** See 28 U.S.C. § 1334(b) ("Notwithstanding any Act of Congress that confers exclusive jurisdiction on a court or courts other than the district courts, the district courts shall have original but not exclusive jurisdiction of all civil proceedings arising under title 11, or arising in or related to cases under title 11.").

**141.** See *Drexel Burnham Lambert Group, Inc. v. Vigilant Ins. Co.*, 130 B.R. 405, 407 (S.D.N.Y.1991); 1 Collier on Bankruptcy ¶ 3.01[4][c][i] (15th ed.1996).

**142.** *Drexel Burnham*, 130 B.R. at 407.

**143.** See *In re Cuyahoga Equipment Corp.*, 980 F.2d 110, 114 (2d Cir.1992) (adopting the "conceivable effect" standard for "related to" bankruptcy jurisdiction); *see also Celotex Corp. v. Edwards*, 514 U.S. 300, 308 n. 6, 115 S.Ct. 1493, 131 L.Ed.2d 403 (1995) (collecting cases and noting that the First, Third, Fourth, Fifth, Sixth, Eighth, Ninth, Tenth, and Eleventh Circuits have adopted the "conceivable effect" test).

**144.** See *In re Wood*, 825 F.2d 90, 97 (5th Cir.1987) ("A proceeding is core if it invokes a substantive right provided by title 11 or if it is a proceeding that, by its nature, could arise only in the context of a bankruptcy case."); *Kerusa Co. LLC v. W10Z/515 Real Estate Ltd. P'ship*, No. 04 Civ. 708, 2004 WL 1048239, at *2 (S.D.N.Y. May 7, 2004).

**145.** See *In re Olympia & York Maiden Lane Co. LLC*, No. 98 B 46167, 1999 WL 58581, at *3 (Bankr.S.D.N.Y. Jan. 25, 1999) ("[T]he core/non-core distinction is [ ] relevant in determining whether we should exercise our subject matter jurisdiction once we have it. Thus, pursuant to § 1334(c)(2), we must abstain from hearing a non-core related proceeding that could not have been brought in federal court...."); 1 Collier on Bankruptcy § 3.01[4][c]. Another reason it is important to distinguish among the types of proceedings is because bankruptcy courts can only determine "arising under" and "arising in" cases, which are collectively known as "core" bankruptcy proceedings. The bankruptcy court can only make recommendations to the district court in "related to" or non-core cases. *See Northern Pipeline Constr. Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982) (holding that bankruptcy courts cannot exercise jurisdiction over matters that were merely "related to" the bankruptcy case).

on a state law claim; (3) the action is "related to" but not "arising in" a bankruptcy case or "arising under" the Bankruptcy Code; (4) section 1334 is the sole basis of federal jurisdiction; (5) an action was commenced in state court; and (6) the action can be "timely adjudicated" in state court.[146]

■ If a proceeding is core, section 1334(c)(1) permits a court to abstain if abstention is "in the interests of justice, or in the interest of comity with State courts or respect for State law." The factors considered for discretionary abstention include: (1) the effect on the efficient administration of the bankruptcy estate; (2) the extent to which issues of state law predominate; (3) the difficulty or unsettled nature of the applicable state law; (4) comity with state courts; (5) the degree of relatedness or remoteness of the proceeding with the main bankruptcy case; (6) the existence of a right to trial by jury; (7) prejudice to the involuntarily removed parties; and (8) the potential for duplicative and uneconomical use of judicial resources.[147]

■ Nonetheless, regardless of which abstention provision governs, "[t]he court to which such claim or cause of action is removed may remand such claim or cause of action on any equitable ground."[148] Courts in this district have treated the discretionary abstention and equitable re-

mand provisions as essentially identical and consider the same factors in deciding whether to abstain and remand.[149]

## B. Discussion

On April 12, 1987, Texaco Inc. (predecessor-in-interest to defendant ChevronTexaco) filed for Chapter 11 relief as a result of a highly-publicized $10.5 billion verdict in favor of Pennzoil. Texaco ultimately succeeded in settling the Pennzoil dispute for $3 billion in cash, and it emerged from bankruptcy protection on March 23, 1988, upon confirmation of its reorganization plan.[150] Among other things, Texaco's Confirmation Order enjoined the "commencement or continuation of any action ... to collect, recover or offset any debt discharged" under the Order.[151] Defendants therefore argue that this Court has bankruptcy jurisdiction because plaintiffs assert pre-petition claims that threaten Texaco's discharge. Defendants add that the Court should not sever ChevronTexaco and remand the cases as against the other defendants because plaintiffs' claims derive from a common nucleus of operative fact, and because severance would be inconsistent with plaintiffs' theories of collective liability.[152]

Plaintiffs respond that there is no bankruptcy jurisdiction because they had no claim when Texaco's bankruptcy was con-

---

**146.** Section 1334(c)(2) provides: "Upon timely motion of a party in a proceeding based upon a State law claim or State law cause of action, related to a case under title 11 but not arising under title 11 or arising in a case under title 11, with respect to which an action could not have been commenced in a court of the United States absent jurisdiction under this section, the district court shall abstain from hearing such proceeding if an action is commenced and can be timely adjudicated in a State forum of appropriate jurisdiction." *See also In re WorldCom, Inc. Secs. Litig.,* 293 B.R. 308, 331 (S.D.N.Y.2003) (explaining that "[a] party is not entitled to mandatory abstention if it fails to prove any *one* of the statutory requirements.").

**147.** *See Kerusa,* 2004 WL 1048239, at *3.

**148.** 28 U.S.C. § 1452(b).

**149.** *See Kerusa,* 2004 WL 1048239, at *3.

**150.** *See In re Texaco Inc.,* 254 B.R. 536, 542 (Bkrtcy.S.D.N.Y.2000) (describing Texaco bankruptcy).

**151.** Order Confirming Second Amended Joint Plan of Reorganization and Authorizing Texaco Inc. to Incur Secured Indebtedness for Purpose of Consummating Plan ¶ 25 ("Confirmation Order"), attached as Exhibit A to Def. Original Opp.

**152.** *See* Notice of Removal ¶¶ 51–57; Def. Original Opp. at 3–5, 7–8, 10; Def. Opp. at 24–25.

cluded. Plaintiffs do not allege that their water was contaminated with MTBE by 1988, and it is the introduction of MTBE into plaintiffs' aquifers that gives rise to plaintiffs' claims. Furthermore, plaintiffs contend that their claims could not have been discharged because plaintiffs did not receive notice that their claims would be discharged if they did not file a claim in bankruptcy. Alternatively, if the Court finds that it has bankruptcy jurisdiction, plaintiffs request either severance of Texaco from the other defendants or equitable remand due to the state law nature of the claims and the remoteness of Texaco's Confirmation Order from these actions and the other defendants.[153]

 Generally, confirmation of a debtor's plan of reorganization vests all property of the estate in the debtor, and the debtor emerges free and clear of all claims and interests of creditors.[154] In addition, confirmation of the plan discharges all debts that arose prior to confirmation of the plan whether or not a proof of claim was filed or the holder of a claim has accepted the plan.[155] A discharge in a title 11 case "operates as an injunction against the commencement or continuation of an action, the employment of process, or an act, to collect, recover or offset any such debt as a personal liability of the debtor."[156] Therefore, no one may assert a claim arising prior to plan confirmation.[157]

 In this case, plaintiffs assert several acts by defendants that allegedly occurred prior to Texaco's Confirmation Order in 1988. Plaintiffs contend the following: "Sometime after 1979," defendants manufactured, distributed, and sold gasoline with certain MTBE concentrations.[158] Defendants knew "at least as early as 1980 of the impact of MTBE and its contamination of water."[159] In October 1980 and April 1983, defendants learned of spills in Rockaway, New Jersey and Jacksonville, Maryland, respectively.[160] In 1986, defendants received and discussed the Garrett Report, a paper warning of inevitable groundwater contamination.[161] "Beginning in the early 1980s," defendants colluded with others to suppress information regarding MTBE.[162] Prior to the petition date, defendants misled the EPA into not testing MTBE under the Toxic Substances Control Act.[163] Defendants also misled the public. For instance, "on April 1 and 2,

---

153. *See* Plaintiff's Memorandum of Law in Support of Motion to Remand in *MTBE III* ("Pl. Original Mem.") at 13–18; Plaintiffs' Reply Brief in Support of their Motion to Remand in *MTBE III* ("Pl. Original Reply") at 1–2.

154. *See* 11 U.S.C. § 1141(b)—(c).

155. *See* 11 U.S.C. § 1141(d)(1)(A) ("Except as otherwise provided in this subsection, in the plan, or in the order confirming the plan, the confirmation of the plan [ ] discharges the debtor from any debt that arose before the date of such confirmation ... whether or not (i) a proof of claim based on such debt is filed or deemed filed under section 501 of this title; (ii) such claim is allowed under section 502 of this title; or (iii) the holder of such claim has accepted the plan....").

156. 11 U.S.C. § 524(a).

157. Under the Bankruptcy Code, a "claim" is a "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured." 11 U.S.C. § 101(5).

158. Compl. ¶ 67.

159. *Id.* ¶ 93.

160. *See id.* ¶¶ 93–95, 109–111.

161. *See id.* ¶¶ 101–108.

162. *Id.* ¶ 118.

163. *See id.* ¶¶ 119–131.

1987" at a Conference on Alcohols and Octane, defendants represented that MTBE gasoline spills had been effectively dealt with, failing to inform the audience that MTBE resists biodegradation and is difficult to remediate.[164] All of these allegations constitute arguably dischargeable claims because they pre-date the confirmation of Texaco's reorganization plan.[165]

This Court has core bankruptcy jurisdiction because questions concerning when certain "claims" arose and whether those claims were discharged involve the enforcement and construction of Texaco's discharge injunction, a substantive right created by the federal Bankruptcy Code.[166] Proceedings to determine the allowance and disallowance of a claim against the estate are core proceedings.[167] Although ChevronTexaco has yet to ask this Court to enforce its Confirmation Order, it has clearly reserved its right to do so.[168] To conclude that the Court lacks core jurisdiction simply because defendants have raised the argument in opposition to remand instead of in an enforcement action would elevate form over substance.

While the Court may abstain in its discretion, abstention is not warranted

---

164. *Id.* ¶ 143.

165. *See In re Chateaugay*, 944 F.2d 997, 1005 (2d Cir.1991) (obligation to reimburse the EPA for response costs is a dischargeable claim whenever based upon a prepetition release or threatened release of hazardous substances); *Texaco, Inc. v. Sanders*, 182 B.R. 937, 951 (S.D.N.Y.1995) (claims based on chromate contamination and migration of subsurface contaminants were "claims" within the meaning of section 101(5) because the events arose prior to the confirmation order); *In re Johns–Manville Corp.*, 57 B.R. 680, 690 (S.D.N.Y.1986) ("[T]he focus should be on the time when the acts giving rise to the alleged liability were performed.... Thus, for federal bankruptcy purposes, a prepetition 'claim' may well encompass a cause of action that, under state law, was not cognizable until after the bankruptcy petition was filed."). *But see In re Texaco, Inc.*, 254 B.R. at 558 (holding that lessors' future claims for possible future breaches of contract by debtor were not "claims" that had to be filed pre-confirmation because all the facts giving rise to breach of contract claims had not occurred pre-confirmation).

166. *See In re National Gypsum Co.*, 118 F.3d 1056, 1064 (5th Cir.1997) ("[A] proceeding to enforce or construe a bankruptcy court's section 524(a) discharge injunction issued pursuant to its confirmation order ... necessarily arises under title 11 and supports a finding that federal jurisdiction exists under 28 U.S.C. § 1334 and that such a proceeding is 'core' under 28 U.S.C. § 157(b)."); *In re Chicago, Milwaukee, St. Paul & Pacific R.R. Co.*, 6

F.3d 1184, 1192—93 (7th Cir.1993) (defendants were entitled to a federal forum to decide whether plaintiffs' contingent contract claim should have been filed in the debtor's reorganization); *Timely Adventures, Inc. v. Phillips Props., Inc.*, No. M–95–049, slip op. at 4 (S.D.Tex. Apr. 3, 1996), attached as Exhibit O to Pl. Original Reply (holding that Texaco was entitled to a federal forum to resolve when certain claims arose and whether they had been discharged). *But see In re Chateaugay*, 944 F.2d at 1004 (recognizing split in authority concerning whether tort victim who had pre-petition contact with tortfeasor has a "claim" in advance of manifestation of injury).

167. *See* 28 U.S.C. § 157(b)(2)(B). *See also In re Manville Forest Prods. Corp.*, 896 F.2d 1384, 1389 (2d Cir.1990) ("[T]he majority of courts that have considered the issues have held that proceedings to determine the allowance and disallowance of claims against the estate are core."); *In re Wood*, 825 F.2d at 98 (contract action was not core proceeding because it did not raise as primary issues such matters as dischargeability and allowance of the claim); *Bevilacqua v. Bevilacqua*, 208 B.R. 11, 16 (E.D.N.Y.1997) (finding that damage claim was not a core proceeding because it would not determine whether plaintiff had a claim against the estate); *Texaco, Inc. v. Sanders*, 182 B.R. at 944 (holding that a proceeding to enforce a confirmation order is a core proceeding under section 157(b)(2)).

168. *See* Notice of Removal ¶ 57.

here for several reasons. *First,* remanding the remaining non-RFG cases would result in the duplicative and uneconomical use of judicial resources and the risk of inconsistent judgments. The Court has federal agent jurisdiction over more than forty MTBE cases, and by exercising its bankruptcy jurisdiction, it can best avoid the waste and inconsistency that multidistrict litigation is intended to resolve.[169] *Second,* the exercise of jurisdiction would promote the efficient administration of Texaco's estate since a bankruptcy court of this district issued the original Confirmation Order. If it were later determined that plaintiffs' claims are pre-petition claims that were not discharged by the Confirmation Order and that ChevronTexaco is liable, plaintiffs may seek leave from this Court to reopen the bankruptcy proceedings. *Third,* the prejudice to the involuntarily removed parties would be minimal because counsel representing the non-RFG plaintiffs are already litigating other MTBE cases before this Court.[170] The removed parties would therefore gain certain

efficiencies because their attorneys would be able to combine briefing, travel time, and court appearances, which would lower the cost of litigation and encourage more effective advocacy. *Fourth,* plaintiffs' right to a jury trial is not affected by this Court's exercise of jurisdiction. *Finally,* although plaintiffs allege state tort law claims, they do not involve difficult or unsettled questions of state law. Thus, the Court declines to abstain from the exercise of jurisdiction based on these factors.[171]

Of course, certain factors also weigh in favor of abstention—namely, the predominance of state law issues, comity with state courts, and the remoteness of the proceedings from the main bankruptcy case. In particular, I have already expressed some reluctance to exercise jurisdiction over dozens of defendants merely because a single defendant filed for bankruptcy and reorganized sixteen years ago.[172] Certainly, there is authority to abstain in such a situation.[173] However, upon further reflection, the exercise of jurisdiction is appro-

---

169. In the absence of federal agent jurisdiction, the balance of factors may have weighed in favor of the Court's abstention from the exercise of bankruptcy jurisdiction.

170. The law firms of Weitz & Luxenberg, P.C. and Baron & Budd, P.C. represent the moving plaintiffs here, as well as most of the other MTBE plaintiffs.

171. During the first round of MTBE cases brought by private well owners, the Court exercised bankruptcy jurisdiction over those consolidated cases without objection from any of the plaintiffs. Weitz & Luxenberg, P.C. represented the Berisha plaintiffs at the time. A few of the Baron & Budd attorneys also represented plaintiffs in *MTBE I* although at that time they were with a different law firm. I raise this only to note that both sides have engaged in a good deal of maneuvering to choose a particular judge or forum when it suited their interest. *See, e.g., County of Suffolk v. Amerada Hess Corp.,* No. 04 Civ. 5424,

2004 WL 1575102, at *5 (S.D.N.Y. July 13, 2004) (noting tortured history of dropping parties in response to jurisdictional motions).

172. *See MTBE III,* 2004 WL 515535, at *10.

173. *See Kerusa,* 2004 WL 1048239, at *6 (abstaining from case concerning water damage and toxic mold infestation in building, in part, because the actions involved the rights of three different sets of plaintiffs and over fifteen defendants, only one of whom was in bankruptcy); *In re Olympia & York,* 1999 WL 58581, at *9 (finding remand appropriate in real property dispute because of, *inter alia,* the remote nexus of the claims to the debtors); *Drexel Burnham,* 130 B.R. at 409 (remanding insurance coverage action because it was remote from the bankruptcy proceedings). *Cf. In re 19 Court Street Assocs., LLC,* 190 B.R. 983 (S.D.N.Y.1996) (noting that "related to" jurisdiction does not lie where the dispute is only remotely related to the bankruptcy estate).

priate because plaintiffs' theories of collective liability cause the defendants to be inextricably intertwined; defendants will stand or fall together.[174] That is, plaintiffs can only recover if liability is apportioned among all manufacturers of MTBE-containing gasoline due to the impossibility of matching particular defendants to specific releases of MTBE. It is for this reason that the Court also declines to sever ChevronTexaco from the cases and remand the cases as against the remaining defendants.

## VII. CONCLUSION

For the foregoing reasons, this Court has federal agent jurisdiction over certain California, Indiana, Vermont, and Virginia cases, and bankruptcy jurisdiction over all the consolidated cases.[175] Defendants have met their burden of establishing federal subject matter jurisdiction and their right to removal. The Clerk of the Court is directed to close these motions. A conference is scheduled for September 23, 2004 at 10:00 a.m.

SO ORDERED.

---

**174.** Plaintiffs assert market share liability, alternative liability, concert of action, and enterprise liability. *See* Compl. ¶¶ 174–177. *Cf. In re WorldCom*, 293 B.R. at 321 (suit against debtor's directors was "related to" the bankruptcy because the conduct of the debtor and the defendants was intertwined and plaintiffs'

theories of liability were interconnected with defendants' rights to contribution).

**175.** See *supra* note 66 for a list of non-RFG and non-OF cases over which this Court has federal agent jurisdiction.